1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

9

ARJUN DUA Derivatively on Behalf of
ZILLOW GROUP, INC.,

10

Plaintiff,

11

v.

12

13  RICHARD N. BARTON, ALLEN W.
PARKER, KATHLEEN PHILLIPS, DAVID A.
14  BEITEL, SPENCER M. RASCOFF, LLOYD D.
FRINK, ERIK C. BLACHFORD, JAY C.
15  HOAG, GREGORY B. MAFFEI, GORDON S.
STEPHENSON, AND APRIL UNDERWOOD,

16

Individual Defendants,

17  -and-

18  ZILLOW GROUP, INC.,

19

Nominal Defendant.

20

NO.

**VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT**

21       Plaintiff Arjun Dua ("Plaintiff"), by his attorneys, submits this Verified Stockholder

22  Derivative Complaint for Violations of Securities Laws, Breach of Fiduciary Duty, Waste of

23  Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following upon information and

24  belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal

25  knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which

26  included, among other things, a review of public filings with the U.S. Securities and Exchange

27

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 1

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Zillow Group, Inc. ("Zillow" or the "Company") against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to Zillow's reputation, goodwill, and standing in the business community and has exposed Zillow to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Zillow in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.      This action seeks to remedy wrongdoings committed by Zillow's directors and officers from November 17, 2014 through the present (the "Relevant Period").

3.      Zillow operates real estate brands on mobile and the web in the United States. The Company was founded by Richard N. Barton and Lloyd D. Frink on July 25, 2014 and is headquartered in Seattle, WA. It operates through three segments: Homes; Internet, Media & Technology; and Mortgages. The Company's platform offers buying, selling, renting, and financing services for residential real estate. It also provides a suite of marketing software and technology solutions and advertising services. The Company's portfolio of consumer brands consists of Zillow, Zillow Offers, Zillow Home Loans, Trulia, StreetEasy, HotPads, Naked Apartments, and Out East; and business brands for real estate, rental, and mortgage professionals include Mortech, dotloop, Bridge Interactive and New Home Feed.

4.      During the Relevant Period, Individual Defendants made false or misleading statements and/or failed to disclose that: (1) the Company had a co-marketing program, which

allowed mortgage lenders ("lenders") to appear alongside the real estate agents ("agents") in advertisements in exchange for the lender making a fixed monthly payment to Zillow ("co-marketing program"). This co-marketing program did not comply with the Real Estate Settlement Procedures Act ("RESPA"); (2) Zillow was instructing and encouraging third-parties to commit violations of RESPA; (3) the Company's statements  regarding the Consumer Financial Protection Bureau ("CFPB's") investigation of its co-marketing program were materially misleading; (4) the co-marketing program allowed lenders to pay more than fair market value for the advertising Zillow provided in return; and  (5) as a result of the foregoing, Zillow's public statements regarding its co-marketing program were materially false and misleading at all relevant times.

5.      As detailed herein, and as alleged in the ongoing federal securities class action in the Western District of Washington styled: *In re Zillow Group, Inc. Securities Litigation*: Case No. 2:17-cv-01387, (the "Federal Securities Class Action"), Zillow's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

6.      The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact. The Individual Defendants also willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

## **BACKGROUND**

7.      Zillow's main source of revenue is from selling advertising to agents. Agents pay Zillow to advertise properties on Zillow's various platforms with their name connected to the

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

listing, and home buyers ("buyers") can provide their contact information so that an agent to reach out to them. As such, in return for paying Zillow for this advertising space, agents are given "leads" on properties they are trying to sell. Agents are mainly concerned with getting leads and use Zillow's platform, primarily with this goal in mind, i.e. that customers submit their contact information on the website to the agent, which means the agent can follow up with them.

8.      The fee structure in relation to the above arrangement is such that Zillow does not charge per lead. Zillow, charges for each "impression" – that is, each time a customer views a listing, whether the customer chooses to reach out to or retain an agent.

9.      The listing by agents on Zillow also includes a form for a potential buyer to give the agent their contact details. Agents who purchase premium advertising services are referred to as "Premier Agents."

10.     In 2013, Zillow launched a "co-marketing" program to allow lenders to appear alongside the real estate agent in advertisements, in exchange for the lender making a fixed monthly payment to Zillow. This covered a fixed percentage of the agent's monthly advertisement expenses.  A customer who submitted their information could opt out of having their information sent to a lender by unchecking the box titled "I would like to receive financing information."

11.     Defendant Rascoff noted in a 2017 interview with cheddar.com [1] that co-marketing is a practice in the real estate industry for agents to send direct mail advertisements to prospective buyers that has been around for a long time, and that a lender may agree to pay for a portion of the advertising cost in exchange for being identified as a "preferred lender". Zillow was the first company to allow lenders to pay for portions of agents' monthly advertising costs

---

[1] https://cheddar.com/media/exclusive-ceo-spencer-rascoff-on-zillows-co-marketing-program (last accessed February 4, 2021).

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 4

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

online. In exchange for paying for some of those costs, the lender appears below the agent's ad as that agent's "preferred lender". The advertisement has a form for the customer to send their contact details to the agent and includes a "check box" that states "I want to be pre- approved." The box is checked by default, and if that box is not unchecked, the contact information provided to the agent is also provided to the lender. If the prospective buyer unchecks the box, the real estate agent is informed, so that the real estate agent can send the contact information to the lender.

12.      Defendant Rascoff misleadingly compared Zillow's co-marketing programs to earlier print co-marketing programs but omitted to note there is an important difference. While print mailings sell advertising space to lenders and agents, Zillow is also delivering **leads** which come off the contact submission forms to lenders and agents. Of course, Zillow does this to bring in additional money from lenders, and agents are compensated and incentivized for these referrals as they save money on their monthly advertising spend.

13.      Specifically, to address the above types of arrangements and protect consumers, RESPA was designed to "eliminat[e] … kickbacks or referral fees that tend to increase unnecessarily the costs of settlement services." 12 U.S.C. § 2601(b)(2). RESPA makes it unlawful for there to be "any fee, kickback or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan…." 12 U.S.C. § 2607(a). RESPA also states that "[n]othing in this section shall be construed as prohibiting . . . the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." 12 U.S.C. 2607(c)(2).

14.      Enforcement of RESPA was, at all material times, the responsibility of the CFPB (created in 2011, pursuant to the Consumer Financial Protection Act ("CFPA"), passed in 2010).

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

The Department of Housing and Urban Development ("HUD") made an interpretive rule in 2010 finding that payments from home warranty companies to agents for marketing services directed at particular homebuyers constituted payments for referrals (See: FR Doc. 2010–15317). Pursuant to HUD regulations, it is illegal for a mortgage servicer, such as a home warranty company or a lender, to pay a real estate agent for a direct recommendation of the mortgage service provider from the real estate agent directly to a buyer. That is because such agents are in a position of trust with respect to the purchaser. HUD has affirmed that RESPA Section 8(c)(2) transactions outlined above are subject to a two-part test, such that: (1) any payments must be compensation for bona fide services performed; and (2) the payments must bear a "reasonable relationship to the value of goods or services actually performed" excluding any referrals. HUD has guided that "payments must be commensurate with that amount normally charged for similar services, goods or facilities. This requires careful consideration of fees paid in relation to price structures and practices in similar transactions and in similar markets."[2]

15.    The CFPA made it illegal for "any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of section 5531 of this title, or any rule or order issued thereunder, and notwithstanding any provision of this title, the provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided." 12 U.S.C. § 5536. Section 5531 prohibits "a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." Brokers and lenders are covered persons under the

---

[2]RESPA Statements of Policy, 2006 WL 3948236, at *4.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 6

statute.

16.     The CFPA provides the CFPB with the authority to take action to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. Agents and lenders are covered persons. Zillow was aware of, or reckless towards the program because, Zillow actively tracked the number of referrals premiere agents provided to lenders. Zillow was also aware that the co-marketing program was not subject to any exceptions to the rules, as it was aware agents paid far in excess of reasonable market rates for co-marketing advertising.

17.     The CFPB brought various enforcement actions in 2015 regarding schemes such as Zillow's co-marketing program, which involved the sharing of advertising costs, raising concerns about "marketing services agreements" ("MSAs") pursuant to which agents enter into contracts with lenders, insurers, or others to share marketing costs. The emphasized skepticism as to whether such agreements are legitimate. The CFPB stated that "many MSAs are designed to avoid RESPA's prohibition on the payment and acceptance of kickbacks and referral fees".

18.     By putting its co-marketing scheme online, in the way that it did, Zillow violated the law, under RESPA, it is illegal for a lender to pay a real estate agent for referrals or leads. Further it is illegal under the Consumer Financial Protection Act to provide "substantial assistance" to another person or entity's violation of consumer protection acts, including RESPA.

19.     HUD regulations prescribe that under RESPA, it is illegal for a lender to pay a real estate agent in exchange for that agent making a personal recommendation of that lender. However, as outlined above, RESPA contains an exception that states that its ban on payments for referrals is inapplicable to **fair market value payments** for legitimate services. Zillow did

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

not satisfy this exception, during the Relevant Period.

20.     During the Relevant Period, Zillow, as the main provider of online real estate advertising, had the ability to ensure that their co-marketing program was compliant by requiring that lenders participating in the program pay **fair market value** for the advertising they purchased. However, Zillow charged lenders extortionate amounts, not the fair market value of those services. Further, Zillow actively monitored and encouraged lenders and agents to violate RESPA, contacting agents to make sure they are making referrals.

**Zillow's Co-Marketing Program**

21.     Zillow's co-marketing program was launched in June of 2013. At that time, and until the beginning of 2017, Zillow permitted any individual lender to pay for up to 50% of the Premier Agent's monthly advertising spend, and up to 5 lenders to pay for 90% of the Premier Agent's advertising spend. If one lender co-markets with the agent, that lender would be advertised alongside the agent in every advertisement, regardless of the contribution. However, if multiple lenders participate, then they are shown at random alongside the agent proportionately with their pro rata contribution.

22.     In a webinar dated March 23, 2016 ("the webinar") representatives of the Company, noted, when explaining the co-marketing program to Premier Agents, that buyers can opt out of Zillow forwarding their information to a co-marketing lender when asking to be contacted by an agent, and that, in practice, on average, the lenders receive 40 contacts for every hundred contacts received by the agent. However, as explained in that webinar, the agent is also provided a list of all prospective buyers who opted out of providing their information to the lender, and Zillow encourages the agent to provide that information to the lender themselves.

23.     Lenders received far fewer leads than agents. Lenders are only notified or in receipt of a lead when the consumer "clicking" on the real estate agent profile also checks the

box requesting information about the lender or seeking pre-approval information. Consumers rarely request this information because they are seeking information about a particular property and first want to contact the real estate agent. As such, lenders receive minimal leads from consumers "clicking" on Zillow. However, most homebuyers do not already have lenders. Therefore, agents typically raise the issue of securing a lender with prospective buyers and providing information about suggested lenders. As to the question of why lenders would continue to participate in Zillow's co-marketing program when there were few click-throughs, it can be inferred lenders paid these extortionate fees because they expected agents to refer business. Lenders probably did not recoup advertising costs through leads from the Zillow site but through the referral relationship forged with the real estate agent.

24.     Despite the fact that RESPA regulations clearly prohibit real estate agents from making personal recommendations for specific lenders to prospective home buyers, Zillow designed the co-marketing program to facilitate just such contacts, and tracked real estate agents' volume of referrals to lenders not to ensure compliance, but as part of a business assessment.

25.     On January 31, 2017, the mortgage originator Prospect Mortgage entered into a consent judgment with the CPPB where it admitted to violating Section 8 of RESPA. It acknowledged that it used co-marketing agreements on a "third party website" to pay real estate agents for referrals. The website as described in that consent judgment mirrors Zillow's premier agent product and no other website that operated during the relevant time frame. The consent judgment stated that "[s]ome agents who co-marketed their services on [Zillow] with [Prospect Mortgage] took additional steps to convince consumers to use Prospect loan officers. For example, one agent told [Prospect Mortgage] that he 'was able to talk [a particular customer] into using you guys for the financing of his purchase."

**The CFPB takes Enforcement Action against Zillow and Zillow Downplays
the Enforcement Action**

26.     As a result of these RESPA violations, the CFPB launched an investigation into Zillow in April 2015 centered around the co-marketing program. Zillow did not disclose this investigation to investors until May of 2017, after receiving a "notice and opportunity to respond and advise" letter, notifying Zillow of the CFPB's specific concerns regarding the illegality of the co-marketing program. Even then, Zillow downplayed the seriousness of the situation, falsely reassuring investors that the program, which was in fact an enormous contributor to Zillow's bottom line, was "small" and falsely claiming that Zillow was still confident that their program was compliant, when in reality Zillow changed the co-marketing program to comply with RESPA in the beginning of 2017 in response to CFPB warnings.

27.     In 2015, the CFPB dramatically increased RESPA enforcement, entering into several enforcement actions and consent orders with various players in the real estate industry. Zillow management and investors were keenly aware of the CFPB's heightened enforcement efforts.

28.     In the beginning of 2017, in response to the CFPB's inquiries, Zillow substantially changed their co-marketing program. Instead of allowing lenders to collectively contribute up to 90% of an agent's advertising spend, Zillow lowered lenders to 50% of that spend. However, they concealed this change from the public and did not even change their own website to reflect the change for several months. This decrease in the maximum amount a lender could pay to an agent for co-marketing costs was not reflected on Zillow's website immediately. As of March 23, 2017, Zillow had not changed its website to reflect this new policy limiting lender payments to agents.

29.     Zillow received a Notice and Opportunity to Respond ("NORA") letter from the

CFPB in February of 2017, stating that the CFPB Office of Enforcement was considering whether to recommend that the CFPB take legal action against Zillow for violation of Section 8 of RESPA, and Section 1036 of the Consumer Financial Protection Act. Zillow responded in March of 2017 and in April of 2017 Zillow received an additional Civil Investigative Demand ("CID"). Finally, in August 2017 the CFPB informed Zillow that it had concluded its investigation, invited Zillow to discuss a possible settlement, and that it intended to pursue an action against Zillow if a settlement was not reached.

30.     On August 8, 2017, the Company was forced to admit the seriousness of their RESPA violations, acknowledging that they had been notified by the CFPB that it intended to charge Zillow if it did not reach a settlement.

31.     On April 19, 2019, the District Court in the Federal Securities Class Action issued an order denying defendants' motion to dismiss. See Dkt. No. 54 in the Federal Securities Class Action. The District Court held that the Complaint adequately alleged, for the purposes of a motion to dismiss, that, taken together, the allegations contained in the second amended complaint allow the Court to draw a reasonable inference that the co-marketing program allowed lenders to pay more than fair market value for the advertising Zillow provided in return. The Court further noted that Plaintiff in the Federal Securities Class Action "assert[s] particularized facts that demonstrate that Zillow designed the co-marketing program to violate RESPA, and that Zillow was instructing and encouraging third-parties to commit such violations." (Dkt. No. 46 at 32., Federal Securities Class Action). In the Federal Securities Class Action, the Court further noted that (1) Zillow's publicly-filed statements regarding general legal compliance, and (2) Philips' and Rascoff's statements regarding the co-marketing program and the CFPB's investigation of it were materially misleading. It confirmed that the Complaint in the Federal Securities Class Action also sufficiently alleged that that Phillips and Rascoff were at least

deliberately reckless in continuing to make statements that the co-marketing program was legally compliant, adequately pleads loss causation, and plausibly alleged a violation of Section 20(a) against Rascoff and Phillips.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

33.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have such jurisdiction.

34.     This Court has personal jurisdiction over each of the Individual Defendants because each Defendant is either a corporation incorporated in this District or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them. The Court has jurisdiction over each defendant because each defendant has sufficient minimum contacts with Washington so as to render the exercise of jurisdiction by the Washington courts permissible under traditional notions of fair play and substantial justice.

35.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Individual Defendants have received substantial compensation in this District by engaging in various activities that had an effect in this District. Venue is proper in this District because the Company and the Individual Defendants have conducted business – including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violations of fiduciary duties owed to Zillow – in this District and Individual Defendants' actions

have had an effect in this District.

## THE PARTIES

### Plaintiff

36.     Plaintiff Arjun Dua is and has continuously been a stockholder of Zillow during the wrongdoing complained of herein.

### Nominal Defendant

37.     Defendant Zillow is a Washington corporation with its principal executive offices at 999 Third Avenue, Suite 4600, Seattle, Washington 98104. Zillow's shares trade on the NASDAQ. During the Relevant Period, two classes of shares of Zillow stock publicly traded. Class A common stock traded throughout the Relevant Period and Class C Capital stock traded from August 3, 2015 onward. Both shares have the same economic rights, however Class C shares have no voting rights. Both shares traded at a close 1 to 1 price ratio throughout the Relevant Period.

### Individual Defendants

38.     Defendant Richard N. Barton ("Defendant Barton") co-founded the Company in 2005 and has served as the Chief Executive Officer ("CEO") since February 2019. Defendant Barton also served as the Executive Chairman of the Company from 2010 until 2019. Defendant Barton previously served as the CEO from December 2004 until September 2010. For the fiscal year ended December 31, 2019, Defendant Barton received $4,488,664 in total compensation from the Company.

39.     Defendant Allen W. Parker ("Defendant Parker") is the Company's Chief Financial Officer ("CFO") since joining the Company in 2018. For fiscal year 2019, Defendant Parker received $6,053,451 in total compensation from the Company.

40.     Defendant Kathleen Phillips ("Phillips") served as the Company's Chief Financial

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Officer ("CFO") from August 2015, Chief Legal Officer since September 2014, and Secretary since July 2010. She retired from her role as CFO on May 31, 2018. Her prior positions with the Company include Chief Operating Officer from August 2013 to August 2015 and General Counsel from July 2010 to September 2014.

41.    Defendant David A. Beitel ("Defendant Beitel") is the Company's Chief Technology Officer ("CTO") since February 2005. For the fiscal year ended December 31, 2019, Defendant Beitel received $5,299,927 in total compensation from the Company.

42.    Defendant Spencer M. Rascoff ("Defendant Rascoff") was the Company's CEO from September 2010 until February 2019. Defendant Rascoff remained an employee of the Company until March 22, 2019. For the fiscal year ended December 31, 2019, Defendant Rascoff received $27,564,917 in total compensation from the Company.

43.    Defendant Lloyd D. Frink ("Defendant Frink") co-founded the Company in 2005 and has served as a director since the Company's inception. In February 2019, Defendant Frink became the Company's Executive Chairman.

44.    Defendant Erik C. Blachford ("Defendant Blachford") has served as a Company director since 2005. Defendant Blachford also served as a member of the Board's Audit Committee during the Relevant Period. For the fiscal year ended December 31, 2019, Defendant Blachford received $200,000 in total compensation from the Company.

45.    Defendant Jay C. Hoag ("Defendant Hoag") has been a director since 2005 and is the Company's Chairman of the Compensation Committee. For the fiscal year ended December 31, 2019, Defendant Hoag received $200,000 in total compensation from the Company.

46.    Defendant Gregory B. Maffei ("Defendant Maffei") has served as a Company director since 2005. Maffei also served as the Chairman of the Company's Audit Committee during the Relevant Period. For the fiscal year ended December 31, 2019, Defendant Maffei

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

received $200,000 in total compensation from the Company.

47.     Defendant Gordon S. Stephenson ("Defendant Stephenson") has served as a Company director since 2005. Gordon also served as a member of the Company's Audit Committee during the Relevant Period. For fiscal year 2019, Defendant Stephenson received $200,000 in total compensation from the Company.

48.     Defendant April Underwood ("Defendant Underwood") has been a Company director since February 2017. She also serves as member of the Company's Compensation Committee. For the fiscal year 2019, Defendant Underwood received $200,000 in total compensation from the Company.

49.     Collectively, Individual Defendants Barton, Parker, Phillips Beitel, Rascoff, Frink, Blachford, Hoag, Maffei, Stephenson, and Underwood, are referred to herein as the "Individual Defendants."

50.     The Individual Defendants, because of their positions with Zillow, possessed the power and authority to control the contents of Zillow's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

## The Individual Defendants' False and Misleading Statements

51.     The Relevant Period begins on November 17, 2014 when Zillow's Initial

Registration Statement became effective. The Initial Registration Statement was signed by Defendants Rascoff and Phillips.

52.     The Initial Registration Statement incorporated by reference Zillow, Inc.'s annual report for the year ending December 31, 2013 filed on Form 10-K with the SEC on February 18, 2014 (the "2013 10-K"). The 2013 10-K, and therefore by reference the Initial Registration Statement, stated the following regarding the Company's adherence to government regulations:

### Government Regulation

The real estate agents, mortgage brokers, banks, property managers, rental agents and some of our other customers and advertisers on our mobile applications and websites are subject to various state and federal laws and regulations relating to real estate, rentals and mortgages. While **we do not believe that we are currently subject to these regulations, we intend to ensure that any content created by Zillow is consistent with them by obtaining assurances of compliance from our advertisers and customers for their activities through, and the content they provide on, our mobile applications and websites.** Since the laws and regulations governing real estate, rentals and mortgages are constantly evolving, it is possible that some part of our business activities **could fall within the scope of regulation or be prohibited altogether at some point in the future.**

(Emphasis added).

53.     The foregoing statement was misleading for failing to disclose that Zillow was subject to RESPA and that Zillow had a co-marketing program which may expose it to violations of RESPA. Zillow's co-marketing program facilitated RESPA violations having lenders pay in excess of the fair market value for co-marketing services. The co-marketing program also violated RESPA by facilitating and encouraging coordination between lenders and real estate agents for the purpose of agents making personal referrals of customers to the lenders in exchange for money. The above statement was further misleading for failing to disclose that Zillow violated the CFPA by providing substantial assistance to brokers and lenders who violated RESPA.

54.     The Initial Registration Statement also included the merger agreement between Zillow, Inc. and Trulia. This included a section entitled "Representations and Warranties of

Zillow." It stated that "[n]either Zillow nor any Zillow Subsidiary is in conflict with, or in default, breach or violation of, (a) any Law applicable to Zillow or any Zillow Subsidiary…."

55.     The above statement was misleading for failing to disclose that Zillow's co-marketing program was designed to allow real estate agents and lenders to violate RESPA and to substantially assist and conceal their violations. Zillow's co-marketing program facilitated RESPA violations by allowing lenders to pay in excess of the fair market value for co-marketing services. The co-marketing program also violated RESPA by facilitating and encouraging coordination between lenders and real estate agents for the purpose of agents making personal referrals of customers to the lenders in exchange for money, in violation of RESPA. The above statement was further misleading for failing to disclose that Zillow violated the CFPA by providing substantial assistance to brokers and lenders who violated RESPA.

56.     On February 17, 2015, Zillow, Inc. filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 ("2014 10-K"). The 2015 10-K was signed by Defendant Rascoff.

57.     The 2014 10-K stated the following regarding the Company's adherence to

**Government Regulations:**

The real estate agents, mortgage brokers, banks, property managers, rental agents and some of our other customers and advertisers on our mobile applications and websites are subject to various state and federal laws and regulations relating to real estate, rentals and mortgages. **We endeavor to ensure that any content created by Zillow is consistent with such laws and regulations by obtaining assurances of compliance from our advertisers and consumers for their activities through, and the content they provide on, our mobile applications and websites.** Since the laws and regulations governing real estate, rentals and mortgages are constantly evolving, it is possible that some part of our business activities could fall within the scope of regulation or be prohibited altogether at some point in the future. (Emphasis Added).

58.     While acknowledging that the Company was subject to the various federal laws regarding real estate, (unlike the Registration Statement), the foregoing statement was still

misleading for failing to disclose that Zillow's co-marketing program allowing agents and lenders to violate RESPA and to substantially assist and conceal their violations. Zillow's co-marketing program facilitated RESPA violations by allowing lenders to pay in excess of the fair market value for co-marketing services. The co- marketing program also violated RESPA by facilitating and encouraging coordination between lenders and real estate agents for the purpose of agents making personal referrals of customers to the lenders in exchange for money, in violation of RESPA. The above statement was further misleading for failing to disclose that Zillow violated the CFPA by providing substantial assistance to brokers and lenders who violated RESPA.

59.     On February 17, 2015, Zillow filed a Form S-8 Registration Statement with the SEC (the "February 2015 S-8"), which registered securities offered to employees pursuant to the amended and restated incentive plan dating to 2011 (the "2011 Incentive Plan"). The February 2015 S-8 was signed by Defendant Rascoff. The February 2015 S-8 was false and misleading as it incorporated the 2014 10-K by reference which was misleading, as outlined above.

60.     On April 1, 2015, Zillow filed a Form S-3 Post-Effective Amendment to the Initial Registration Statement with the SEC (the "Form S-3"). The form S-3 was signed by Defendant Rascoff. The Form S-3 registered 124,716 shares of Class A Common Stock. The Form S-3 was false and misleading as it incorporated the 2014 10-K by reference which was misleading as outlined above.

61.     On August 17, 2015, Zillow filed a Form S-8 Registration Statement with the SEC (the "August 17, 2015 S-8"), which registered securities offered to employees pursuant to the 2011 Incentive Plan. The August 17, 2015 S-8 was signed by Defendants Rascoff and Phillips. The August 17, 2015 S-8 was false and misleading as it incorporated the 2014 10-K by reference which was misleading as outlined above.

62.     On August 21, 2015, Zillow filed a Form S-8 Registration Statement with the SEC (the "August 21, 2015 S-8"), which amended and restated the 2011 Incentive Plan by amending the securities to be offered to employees in employee benefit plans. The August 21, 2015 S-8 was signed by Defendants Rascoff and Phillips. The August 21, 2015 S-8 was false and misleading as it incorporated the 2014 10-K by reference which was misleading as set forth above.

63.     On November 3, 2015, on a call with investors, an analyst asked "can you just give us a sense for how much the mortgage co-advertising is contributing to agent revenue? And kind of where penetration is? Where you think it can go? And is the RESPA or CFPB kind of investigations into this is – is this something that should be a concern? Or something that you think is not really an issue?" Phillips responded by stating that "co-marketing with lenders and agents is **a very small part of our business, a small contributor to ARPA revenue**. Importantly though, we are not seeing lenders depart from this program notwithstanding all of the discussions in the marketplace about the CFPB and the CFPB's recent pronouncements and actions. **I can assure you that we work diligently to comply with all of the rules put forth by government agencies and of course, we monitor the CFPB and the things that they are saying and doing to make sure that we remain in compliance and to make sure that we understand how their activities relate to our business.**" (Emphasis Added).

64.     The foregoing statement was misleading for failing to disclose that Zillow's co-marketing program was designed to allow real estate agents and lenders to violate RESPA and to substantially assist and conceal their violations. Zillow's co-marketing program facilitated RESPA violations by allowing lenders to pay in excess of the fair market value for co-marketing services. The co-marketing program also violated RESPA by facilitating and encouraging coordination between lenders and agents for the purpose of agents making personal referrals of

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 19

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

customers to the lenders in exchange for money, in violation of RESPA. The foregoing statement was also misleading for failing to disclose that the CFPB had issued a civil investigative demand attempting to determine whether the co-marketing program violated RESPA. The foregoing statement was further misleading for failing to disclose that Zillow violated the CFPA by providing substantial assistance to brokers and lenders who violated RESPA.

65.     On February 12, 2016, Zillow filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 ("2015 10-K"). The 2015 10-K was signed by Defendants Rascoff and Phillips.

66.     The 2015 10-K stated the following regarding the Company's adherence to government regulations:

### Government Regulation

… [T]he real estate agents, mortgage professionals, banks, property managers, rental agents and some of our other customers and advertisers on our mobile applications and websites are subject to various state and federal laws and regulations relating to real estate, rentals and mortgages. **We endeavor to ensure that any content created by Zillow is consistent with such laws and regulations by obtaining assurances of compliance from our advertisers and consumers for their activities through, and the content they provide on, our mobile applications and websites.**

(Emphasis added).

67.     This statement was misleading for failing to disclose that Zillow's co-marketing program was designed to allow real estate agents and lenders to violate RESPA and to substantially assist and conceal their violations. Zillow's co-marketing program facilitated RESPA violations by allowing lenders to pay in excess of the fair market value for co-marketing services. The co- marketing program also violated RESPA by facilitating and encouraging coordination between lenders and real estate agents for the purpose of agents making personal referrals of customers to the lenders in exchange for money, in violation of RESPA. The

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 20

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

foregoing statement was also misleading for failing to disclose that the CFPB had issued a civil investigative demand attempting to determine whether the co-marketing program violated RESPA. The foregoing statement was further misleading for failing to disclose that Zillow violated the CFPA by providing substantial assistance to brokers and lenders who violated RESPA.

68.     On March 4, 2016, Zillow filed a Form S-8 Registration Statement with the SEC (the "March 2016 S-8"), which registered securities offered to employees pursuant to the 2011 Incentive Plan. The March 2016 S-8 was signed by Defendants Rascoff and Phillips. The March 2016 S-8 was false and misleading as it incorporated the 2015 10-K by reference which was misleading as outlined above.

69.     On August 5, 2016, Zillow filed a Form S-8 Registration Statement with the SEC (the "August 2016 S-8"), which registered securities offered to employees pursuant to the 2011 Incentive Plan. The August 2016 S-8 was signed by Defendants Rascoff and Phillips. The August 2016 S-8 was false and misleading as it incorporated the 2015 10-K by reference which was misleading as outlined above.

70.     On February 2, 2017, Zillow filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2016 ("2016 10-K"). The 2016 10-K was signed by Defendants Rascoff and Phillips.

71.     The 2016 10-K stated the following regarding the Company's adherence to government regulations:

**Government Regulation**

… [T]he real estate agents, mortgage professionals, banks, property managers, rental agents and some of our other customers and advertisers on our mobile applications and websites are subject to various state and federal laws and regulations relating to real

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

estate, rentals and mortgages. **We endeavor to ensure that any content created by Zillow is consistent with such laws and regulations by obtaining assurances of compliance from our advertisers and consumers for their activities through, and the content they provide on, our mobile applications and websites.**

(Emphasis added).

72.     The foregoing statement was misleading for failing to disclose that Zillow's co-marketing program was designed to allow real estate agents and lenders to violate RESPA and to substantially assist and conceal their violations. Zillow's co-marketing program facilitated RESPA violations by allowing lenders to pay in excess of the fair market value for co-marketing services. The co- marketing program also violated RESPA by facilitating and encouraging coordination between lenders and real estate agents for the purpose of agents making personal referrals of customers to the lenders in exchange for money, in violation of RESPA. The foregoing statement was also misleading for failing to disclose that the CFPB had issued a civil investigative demand attempting to determine whether the co-marketing program violated RESPA. The above statement was further misleading for failing to disclose that Zillow violated the CFPA by providing substantial assistance to brokers and lenders who violated RESPA.

73.     During a conference call with analysts that same day, Phillips explained that the CFPB has been reviewing the co- marketing program for compliance with RESPA, that the CFPB provided more information, and that "**we believe our co-marketing program has, and continues to, allow agents and lenders to comply with the law while using our product.**" (Emphasis Added). An analyst on that call asked about the amount of business done through co-marketing type arrangements, and whether there had been any changes in behavior by agents or lenders given the CFPB's actions. "On the CFPB, we don't break out the amount of the revenue that comes from co-marketing efforts, but we have said and it continues to be the case that **it's a small portion of overall revenue**. In terms of changes in behavior, we haven't observed anything

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

specific, but I can tell you that real estate agents and lenders are pretty keenly aware of the restrictions that are placed upon their co-marketing efforts through RESPA and other regulatory regimes. So they are intent on complying and pay close attention to their own behavior, monitoring themselves. We think though the way that we have put this product together enabled agents and lenders to participate in full compliance with the law." (Emphasis Added).

74.     The foregoing statement was misleading for failing to disclose that Zillow's co-marketing program was designed to allow real estate agents and lenders to violate RESPA and to substantially assist and conceal their violations. Zillow's co-marketing program facilitated RESPA violations by allowing lenders to pay in excess of the fair market value for co-marketing services. The co- marketing program also violated RESPA by facilitating and encouraging coordination between lenders and agents for the purpose of agents making personal referrals of customers to the lenders in exchange for money, in violation of RESPA. The foregoing statement was also misleading for failing to disclose that the CFPB had issued a civil investigative demand attempting to determine whether the co-marketing program violated RESPA. In addition, the statements "we believe our co-marketing program has, and continues to, allow agents and lenders to comply with the law while using our product" and "[w]e think though the way that we have put this product together enabled agents and lenders to participate in full compliance with the law" are misleading for failing to disclose that Zillow had already altered the co-marketing program in an attempt to remedy RESPA violations the CFPB had already identified to Zillow. The foregoing statement was further misleading for failing to disclose that Zillow violated the CFPA by providing substantial assistance to brokers and lenders who violated RESPA. Further, the estimated the later estimated loss of the co-marketing program was a 20-50% decline in Zillow's 2018 EBITDA. This demonstrated that Zillow's statement that the marketing program was "small" and therefore did not pose any threat to Zillow's revenue, income or business

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

prospects, was false.

75.     On February 10, 2017, Zillow filed a Form S-8 Registration Statement with the SEC (the "February 2017 S-8"), which registered securities offered to employees pursuant to the 2011 Incentive Plan. The February 2017 S-8 was signed by Defendants Rascoff and Phillips. The February 2017 S-8 was false and misleading as it incorporated the 2016 10-K by reference which was misleading as set forth above.

76.     On May 24, 2017, Rascoff appeared on the internet-based television channel Cheddar.com, and stated "two years ago the CFPB started asking us questions about this [the co-marketing program] and we've been talking with them literally for two years. We think the way we've constructed the program is completely compliant and allows agents and lenders to stay within the confines of the laws that govern this, but we're still talking to the CFPB about it so we'll see. We haven't disclosed the amount of revenue, we've said it's small, but we haven't disclosed it, and, you know, it's an ongoing conversation. "He was then asked "if it's a case where you had to alter the co-marketing program how much of an impact would it be on the company". Rascoff responded that "… it's really hard to speculate hypothetically because we have no idea whether this ends up being blessed or not. It could have no impact or it could have an impact."

77.     The foregoing statement was misleading for failing to disclose that Zillow's co-marketing program was designed to allow real estate agents and lenders to violate RESPA and to substantially assist and conceal their violations. Zillow's co-marketing program facilitated RESPA violations by allowing lenders to pay in excess of the fair market value for co-marketing services. The co- marketing program also violated RESPA by facilitating and encouraging coordination between lenders and real estate agents for the purpose of agents making personal referrals of customers to the lenders in exchange for money, in violation of RESPA. The

foregoing statement was also misleading for failing to disclose that the CFPB had issued a civil investigative demand attempting to determine whether the co-marketing program violated RESPA. In addition, the statement "the way we've constructed the program is completely compliant" is misleading because, in reality, Zillow had already altered the co-marketing program in an attempt to remedy RESPA violations identified by the CFPB. The statement "… it's really hard to speculate hypothetically because we have no idea whether [the co-marketing program] ends up being blessed or not" is misleading for failing to disclose that Zillow had already altered the co-marketing program in an attempt to remedy RESPA violations identified by the CFPB. The foregoing statement was further misleading for failing to disclose that Zillow violated the CFPA by providing substantial assistance to brokers and lenders who violated RESPA.

### THE TRUTH EMERGES

78.     On May 4, 2017, in a 10-Q quarterly report, Zillow revealed that it had received a Civil Investigative Demand from the CFPB in 2015. Zillow also disclosed that it received a Notice and Opportunity to Respond ("NORA") letter from the CFPB in February of 2017, stating that the CFPB Office of Enforcement was considering whether to recommend that the CFPB take legal action against Zillow for violation of Section 8 of RESPA, and Section 1036 of the Consumer Financial Protection Act, that Zillow responded in March of 2017, and that in April of 2017 Zillow received an additional Civil Investigative Demand.

79.     During a conference call that same day with investors, Phillips provided further detail, stating that the CFPB has been reviewing the co-marketing program for compliance with RESPA, that the CFPB provided more information, and that "**we believe our co-marketing program has, and continues to, allow agents and lenders to comply with the law while using our product.**" An analyst on that call asked about the amount of business done through co-

marketing type arrangements, and whether there had been any changes in behavior by agents or lenders given the CFPB's actions. "On the CFPB, we don't break out the amount of the revenue that comes from co-marketing efforts, but we have said and it continues to be the case that it's a **small portion of overall revenue**. In terms of changes in behavior, we haven't observed anything specific, but I can tell you that real estate agents and lenders are pretty keenly aware of the restrictions that are placed upon their co-marketing efforts through RESPA and other regulatory regimes. So they are intent on complying and pay close attention to their own behavior, monitoring themselves. **We think though the way that we have put this product together enabled agents and lenders to participate in full compliance with the law.**" Because of Phillips' false assurance that the co- marketing program accounted for a "small" amount of revenue, that no changes had been made and that its co-marketing program currently and in the past complied with the law, the market did not react to the revelation of the investigation. (Emphasis Added).

80.    Investors learned about the unlawfulness of the co-marketing program and the extent of exposure it had caused, when, on May 17, 2017 when Shyim Patel ("Patel") of Susquahana Financial Group, released a sensitivity analysis of the potential for an adverse CFPB ruling to negatively impact Zillow's revenue and income. That research indicated that in excess of 10% of Zillow's revenue was exposed to illegal co-marketing, and that revenues from co-marketing are highly profitable, with EBITDA margins of 50- 80%, as compared to the rest of Zillow's business, which operated at a loss throughout the Relevant Period. That is, the costs of the co-marketing program are quite low, so the revenues are highly profitable. Therefore, Patel estimated that a loss of the co-marketing program could lead to a 20-50% decline in Zillow's 2018 EBITDA. This demonstrated that Zillow's statement that the marketing program was "small" and therefore did not pose any threat to Zillow's revenue, income or business prospects,

1 was false.

2      81.     On this news, Zillow's Class A share price dropped $2.46 to $41.64, a drop of

3 6.24%. Zillow's Class C share price dropped $3.02 to $41.37, a drop of 6.80%.

4      82.     On August 8, 2017, the Company filed a quarterly report on Form 10-Q with the

5 SEC, announcing the Company's financial and operating results for the quarter ended June 30,

6 2017, stating in relevant part:

7

8         In April 2017, we received a Civil Investigative Demand from the Consumer
Financial Protection Bureau ("CFPB") requesting information related to our
9         March 2017 response to the CFPB's February 2017 Notice and Opportunity to
Respond and Advise ("NORA") letter. The NORA letter notified us that the
10         CFPB's Office of Enforcement was considering whether to recommend that the
CFPB take legal action against us, alleging that we violated Section 8 of the Real
11         Estate Settlement Procedures Act ("RESPA") and Section 1036 of the Consumer
Financial Protection Act ("CFPA"). This notice stemmed from an inquiry **that**
12         **commenced in 2015** when we received and responded to an initial Civil
Investigative Demand from the CFPB. We continue to cooperate with the CFPB
13         in connection with requests for information. Based on correspondence from the
CFPB in August 2017, we understand that it has concluded its investigation. The
14         CFPB has invited us to discuss a possible settlement and indicated that it intends
to pursue further action if those discussions do not result in a settlement. We
15         continue to believe that **our acts and practices are lawful and that our**
**comarketing program allows lenders and agents to comply with RESPA**, and
16         we will vigorously defend against any allegations to the contrary. Should the
CFPB commence an action against us, it may seek restitution, disgorgement,
17         civil monetary penalties, injunctive relief or other corrective action. We cannot
provide assurance that the CFPB will not commence a legal action against us in
18         this matter, nor are we able to predict the likely outcome of any such action. We
have not recorded an accrual related to this matter as of June 30, 2017 or
19         December 31, 2016. There is a reasonable possibility that a loss may be incurred;
however, the possible loss or range of loss is not estimable. (Emphasis Added).
20

21

22      83.     This final disclosure showed the Company had been withholding from the

23 investing public its knowledge of the CFPB's investigation into its unlawful co-marketing from

24 since 2015. Even though it was clear that the Company's practices were unlawful, by this stage,

25 the Company continued to downplay the significance of the possible legal exposure, as a result

26 of its unlawful co-marketing program, in this disclosure.

27

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

84.     Following the news that the CFPB had determined that the co- marketing program had violated the law, and that the CFPB intended to seek remedial action against Zillow, its Class A share price fell $7.49, or 15.7%, on the following two days to close at $40.25 on August 10, 2017. Zillow's Class C share price fell $7.43, or 15.5%, on the following two trading days to close at $40.50 on August 10, 2017.

85.     As a result of Individual Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, the Company has suffered significant losses and damages.

**The False and Misleading Proxies**

86.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, certain Individual Defendants (the "Proxy Defendants") also caused the Company to issue false and misleading proxy statements during the Relevant Period. The Proxy Defendants drafted, approved, and reviewed two Form DEF14As before they were filed with the SEC on April 27, 2015 ("the 2015 Proxy"), April 25, 2016 ("the 2016 Proxy") and April 26, 2017 ("the 2017 Proxy") (together "the Proxies"). The Proxy Defendants negligently issued materially misleading statements the Proxies.[3]

87.     The 2015 Proxy sought stockholder votes to, among others, elect certain Individual Defendants for a three-year term.

88.     In support of the Proxy Defendants' bid to reelect themselves, the 2015 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Zillow faces, including legal and regulatory risks, financial controls, and risks associated with

---

[3] These proxy allegations are based solely on negligence, they were not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

compensation programs and plans. The 2015 Proxy first stated:

**Risk Oversight**

The board of directors considers the assessment of company risks and strategies for risk mitigation to be a responsibility of the entire board (as reported by and through the appropriate committee in the case of risks that are under the purview of a particular committee). **The board engages in risk oversight on a broad range of matters, including challenges associated with strategic acquisitions and threats to our information security systems**…The audit committee provides oversight concerning our major financial risk exposures and the steps management has taken, including the implementation of enterprise risk management programs, to monitor and control such exposures. Each committee generally reports on its discussions to the full board of directors during the committee reports portion of the next board meeting. This enables the board of directors and its committees to coordinate its risk oversight roles.

**Board Committees**

The board of directors currently has the following standing committees: audit, compensation, and nominating and governance. The board of directors may, from time to time, form a new committee or disband a current committee depending on the circumstances and needs of the Company. Each standing committee complies with the independence and other requirements established by the SEC, Nasdaq, and applicable laws and regulations. Membership of the standing committees is determined annually by the board of directors with consideration given to the recommendation of the nominating and governance committee. Adjustments to committee assignments may be made at any time.

The board of directors has adopted a written charter for each standing committee. Shareholders may access a copy of each standing committee's charter on the Investor Relations section of our website at http://investors.zillowgroup.com/corporate-governance.cfm. A summary of the duties and responsibilities of each standing committee is set forth below.

**Audit Committee**

Our audit committee oversees our corporate accounting and financial reporting process, internal accounting and financial controls and audits of the financial statements. Our audit committee also (a) evaluates the independent auditor's qualifications, independence and performance; (b) engages and provides for the compensation of the independent auditor; (c) establishes the policies and procedures for the retention of the independent auditor to perform any proposed permissible non-audit services; (d) reviews our annual audited financial statements; (e) reviews our critical accounting policies, our disclosure controls and procedures and internal controls over financial reporting; (f) discusses with management and the independent auditor the results of the annual audit and the reviews of our quarterly unaudited financial statements; and (g) reviews related-person transactions that are disclosed under Item 404 of Regulation S-K. Our board of directors has determined that each of our audit committee members meets the requirements for independence and financial literacy under the applicable rules and regulations of the SEC and Nasdaq. Our board of directors has determined that each of Messrs. Blachford, Gurley and Maffei is an audit committee financial expert as defined under the applicable rules and regulations of the SEC.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

89.     Second, the 2015 Proxy stated:

**AUDIT COMMITTEE REPORT**

In connection with the Trulia transaction, the individuals who served on the audit committee of Zillow immediately prior to the completion of the Trulia transaction were designated and appointed to the audit committee of the Zillow Group board, including Mr. Maffei as Chairman. The audit committee assists our board of directors in oversight of (a) our accounting and financial reporting processes and the audits of our financial statements, (b) the independent auditor's qualifications, independence and performance, (c) our internal audit function, if any, and the performance of our internal accounting and financial controls, and (d) our compliance with legal and regulatory requirements. Ernst & Young LLP, acting as an independent registered public accounting firm, is responsible for auditing the financial statements prepared by our management.

In connection with our review of Zillow's audited financial statements for the fiscal year ended December 31, 2014, we relied on reports received from Ernst & Young LLP as well as the advice and information we received during discussions with Zillow's management. In this context, we hereby report as follows:

(i)     The audit committee has reviewed and discussed the audited financial statements for fiscal year 2014 with Zillow's management.

(ii)     The audit committee has discussed with the independent registered public accounting firm the matters required to be discussed by the statement on Auditing Standard No. 16, *Communications with Audit Committees*.

(iii)     The audit committee has received the written disclosures and the letter from the independent registered public accounting firm required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent registered public accounting firm's communications with the audit committee concerning independence, and has discussed with the independent registered public accounting firm the independent registered public accounting firm's independence.

(iv)     Based on the review and discussion referred to in paragraphs (i) through (iii) above, the audit committee recommended to Zillow's board of directors that the audited financial statements be included in Zillow's Annual Report on Form 10-K for the year ended December 31, 2014, for filing with the SEC.

90.     The 2015 Proxy assured stockholders that the Individual Defendants were involved with Zillow's operations, actively monitored the Company's risks and exposures, and

acted in an ethical and legal manner. In reality, the Individual Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the Company's failure to disclose:(1) the Company had a co-marketing program, which allowed lenders to appear alongside agents in advertisements in exchange for the lender making a fixed monthly payment to Zillow. The co-marketing program did not comply with RESPA; (2) Zillow was instructing and encouraging third-parties to commit violations of RESPA (3) the Company's statements  regarding the CFPB's investigation of its co-marketing program were materially misleading; (4) the co-marketing program allowed lenders to pay more than fair market value for the advertising Zillow provided in return (5) as a result of the foregoing, Zillow's public statements regarding its co-marketing program were materially false and misleading at all relevant times.

91.     As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect certain Individual Defendants.

92.     The 2015 Proxy was false and misleading because, while it assured investors that Zillow's Code of Business Conduct and its Audit Committee Charter were followed during the preceding fiscal year, the omissions and non-disclosures during the Relevant Period, as outlined herein, demonstrated that the Individual Defendants did not comply with the stated provisions of those documents when filing public statements regarding the affairs of the Company with the SEC.

93.     The 2016 Proxy and the April 26, 2017 each contained nearly identical provisions to the 2015 Proxy outlined above, and were thus materially false and misleading for the same reasons outlined above.

## FIDUCIARY DUTIES

94.     By reason of their positions as officers and directors of the Company, each of the

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 31

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Individual Defendants owed and continues to owe Zillow and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Zillow in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Zillow and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

95.     Each Individual Defendant owes and continues to owe Zillow, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

96.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Zillow, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Zillow, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

97.     To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

        (a)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial

and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)    conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(c)    remain informed as to how Zillow conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(d)    truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

## Duties Pursuant to the Company's Code of Business Conduct and Ethics

98.    As members of Zillow's Board of Directors ("Board"), Defendants (defined below) were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records. The Company's Code of Conduct[4] states in relevant part:

**Compliance with Laws, Rules and Regulations**

The Company requires that all persons subject to this Code comply with all laws, rules and regulations applicable to the Company wherever it does business. Every person subject to this Code is expected to use good judgment and common sense in seeking to comply with all applicable laws, rules and regulations and to ask for advice from the General Counsel when uncertainties arise.

If any person subject to this Code becomes aware of the violation of any law, rule or regulation by the Company, whether by its officers, employees, directors, or any third party doing business on behalf of the Company, it is such person's responsibility to follow the guidelines described in the Reporting and Compliance Procedures section below to promptly report the matter to such person's supervisor or the General Counsel or, if you are an executive officer or director, to the Chair of the Nominating and Governance Committee of the Board of Directors of Zillow Group, Inc. (the "Board").

99.    Further, the conduct of Defendants complained of herein involves a

---

[4] See Zillow Group, Inc. Code of Conduct, https://s24.q4cdn.com/723050407/files/doc_downloads/governance/Policy_Code_of_Conduct.pdf (last accessed January 27, 2021).

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 33

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

knowing and culpable violation of their obligations as directors and officers of Zillow, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that Defendants were aware posed a risk of serious injury to the Company.

100.    Zillow maintains a Code of Ethics, which states:

**Principles Governing Professional and Ethical Conduct**

It is the policy of Zillow Group, Inc. (the "Company") that the Company's Chief Executive Officer, Chief Financial Officer, principal accounting officer and controller (or persons performing similar functions) adhere to, advocate and promote the following principles:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and other public communications made by the Company; and

- Compliance with governmental laws, rules and regulations applicable to the Company. As used in this Code, the term "Company" includes Zillow Group, Inc. and all companies of which Zillow Group, Inc. owns and has the right to vote shares or other interests representing more than 50% of the voting power of such companies, whether directly or indirectly through one or more intermediaries.

## AUDIT COMMITTEE CHARTER

101.    In addition to these duties, the Individual Defendants who served on the Audit Committee during the Relevant Period, Defendants Blachford, Maffei, and Stephenson ("the Audit Committee Defendants"), owed specific duties to Zillow under the Audit Committee

Charter (the "Audit Charter").[5] Specifically the Audit Charter provided for the following responsibilities of the Audit Committee Defendants to:

> The Committee shall have the following duties and responsibilities, in addition to any duties and responsibilities assigned to the Committee from time to time by the Board.

> **Engagement of Independent Auditor**

> 1. Select and retain the independent auditor; determine and approve compensation of the independent auditor; resolve disagreements between management and the independent auditor regarding financial reporting; oversee and evaluate the work of the independent auditor and, where appropriate, replace the independent auditor, with the understanding that the independent auditor shall report directly to the Committee.

> 2. Establish policies and procedures for the review and pre-approval by the Committee of all auditing services and permissible non-audit services (including the fees and terms thereof) to be performed by the independent auditor.

> **Evaluate Independent Auditor's Qualifications, Performance and Independence**

> 3. At least annually, evaluate the independent auditor's qualifications, performance and independence, including that of the lead partner.

> 4. At least annually, obtain and review a report by the independent auditor describing the firm's internal quality control procedures; any material issues raised by the most recent internal quality control review, peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, relating to one or more audits carried out by the firm and any steps taken to deal with any such issues.

> 5. At least annually, obtain and review the letter and written disclosures from the independent auditor required by applicable requirements of the Public Company Accounting Oversight Board (the "PCAOB") regarding the independent accountant's communications with the audit committee concerning independence, including a formal written statement by the independent auditor delineating all relationships between the auditor and the Company; actively engage in a dialogue with the auditor with respect

---

[5] See Zillow Audit Committee Charter at: https://s24.q4cdn.com/723050407/files/doc_downloads/committee_charters/Z_WebDoc_8885.pdf (last accessed January 28, 2021).

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

to that firm's independence and any disclosed relationships or services that may impact the objectivity and independence of the auditor; and take appropriate action to oversee the independence of the outside Auditor.

6. Discuss with the independent auditor the matters required to be discussed by the statement on Auditing Standard 1301 ("Communications with Audit Committees"), as amended from time to time, together with any other matters as may be required for public disclosure or otherwise under applicable laws, rules and regulations.

7. Ensure that the independent auditor is in compliance with the partner rotation requirement of the Securities Exchange Act of 1934, as amended, and any related rules established thereunder by the SEC.

**Review Financial Statements and Financial Disclosure**

8. Prior to filing any periodic report with the SEC, meet with management and the independent auditor to review and discuss the annual audited financial statements (including the report of the independent auditor thereon) and quarterly unaudited financial statements, including in each case the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

9. Regularly review with the independent auditor any audit problems or difficulties and management's response, including any restriction on the scope of activities, access to required information, the adequacy of internal controls, adjustments noted or proposed by the independent auditor but not taken (as immaterial or otherwise) by management, communications between the audit team and the national office concerning auditing or accounting issues, and any management or internal control letters issued or proposed to be issued by the auditor.

10. If so determined by the Committee, based on its review and discussion of the audited financial statements with management and the independent auditor, its discussions with the independent auditor regarding the matters required to be discussed by statement on Auditing Standard 1301 ("Communications with Audit Committees"), as amended from time to time, and its discussions regarding the auditor's independence, recommend to the Board whether the audited financial statements be included in the Company's annual report on Form 10-K.

11. Review earnings press releases, including all quarterly earnings releases, in advance of their dissemination. Discuss or review corporate policies with respect to

financial information and earnings guidance provided to analysts and rating agencies.

**Periodic Assessment of Accounting Practices and Policies and Risk and Risk Management**

12. Obtain and review timely reports from the independent auditor regarding (a) all critical accounting policies and practices to be used, (b) all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor, and (c) other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

13. Review at least annually (a) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies, (b) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, and (c) the effect of regulatory and accounting initiatives on the financial statements of the Company.

14. Review and discuss with management from time to time the effectiveness of, or any deficiencies in, the design or operation of disclosure controls and procedures or internal controls and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls. Review any report issued by the Company's independent auditor regarding management's assessment of the Company's internal controls.

15. Discuss policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

**Related-Person Transactions**

16. Review policies and procedures with respect to transactions between the Company and officers and directors, or affiliates of officers or directors, or transactions that are not a normal part of the Company's business, and review and approve those related-person transactions that would be disclosed pursuant to

SEC Regulation S-K, Item 404.

**Internal Audit Review**

17. Review, and discuss with the independent auditor, the responsibilities, functions and performance of the Company's internal audit department, if any, including internal audit plans, budget, staffing and the scope and results of internal audits.

**Proxy Statement Report of Audit Committee**

18. Approve the Audit Committee Report required by the rules of the SEC to be included in the Company's annual proxy statement.

**Hiring Policies**

19. Set clear hiring policies for the Company's hiring of employees or former employees of the independent auditor who were engaged on the Company's account (including past and present members of the audit engagement team), and ensure that such policies comply with any regulations applicable to the Company from time to time.

**Complaint Procedures and Ethics Compliance**

20. Establish procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters pursuant to and to the extent required by laws, rules and regulations applicable to the Company from time to time.

21. Establish and oversee procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters pursuant to and to the extent required by laws, rules and regulations applicable to the Company from time to time.

22. Establish and oversee a code of ethics for senior financial officers pursuant to and to the extent required by laws, rules and regulations applicable to the Company from time to time and assist the Board in the oversight of such code of ethics.

23. In conjunction with the Nominating and Governance Committee, develop and monitor compliance with a code of conduct applicable to the Company's directors, officers and employees pursuant to and to the extent required by laws, rules and regulations applicable to the Company from time to time.

**Legal Matters**

24. Review legal and regulatory matters that may have a material impact on the financial statements and related Company compliance policies and programs.

## **BREACHES OF DUTIES**

102.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Zillow, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

103.    The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information, including that: (1) the Company had a co-marketing program, which allowed lenders to appear alongside agents in advertisements in exchange for the lender making a fixed monthly payment to Zillow. The co-marketing program did not comply with RESPA; (2) Zillow was instructing and encouraging third-parties to commit violations of RESPA (3) the Company's statements  regarding the CFPB's investigation of its co-marketing program were materially misleading; (4) the co-marketing program allowed lenders to pay more than fair market value for the advertising Zillow provided in return (5) as a result of the foregoing, Zillow's public statements regarding its co-marketing program were materially false and misleading at all relevant times.

104.    The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Zillow substantial damage.

105.    The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The members of the Audit Committee breached their duty

1
2
3

of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Zillow's public statements and internal control function.

4
5
6
7
8
9
10
11

106.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Zillow, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, Zillow has expended, and will continue to expend, significant sums of money.

12

## DAMAGES TO ZILLOW

13
14
15
16
17
18

107.    Plaintiff, derivatively on behalf of Zillow, seeks relief for the damage sustained, and to be sustained, by Zillow as a result of Defendants' breaches of their fiduciary duties and knowing and/or intentional behavior. Defendants' breaches of their fiduciary duties have proximately caused, and will continue to cause, Zillow to suffer substantial monetary damages as a result of the wrongdoing herein, including, among other things:

19
20

(a)    costs incurred from investigating, defending and paying any settlement or judgment in the Securities Class Actions for violations of federal securities laws;

21
22
23

(b)    damage to Zillow's reputation and good will (including perhaps irreparable damage to Zillow's reputation and credibility with insurance and securities regulators, and to Zillow's reputation and credibility in the business, insurance, and financial communities);

24
25

(c)    the resultant loss of business and business opportunities;

(d)    increased costs of capital;

26
27

(e)    a huge loss in market value and stockholder equity; and

(f)     costs incurred in connection with the CFPB investigation and possible fines and/or penalties.

108.    Zillow has been directly and substantially injured by reason of Individual Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company. Plaintiff, as a stockholder and representative of Zillow, seeks damages and other relief for the Company, in an amount to be proven at trial.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

109.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties, abuse of control, waste of corporate assets, unjust enrichment and violations of Section 14(a) of the Securities Exchange Act of 1934 by Individual Defendants.

110.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

111.    During wrongful course of conduct at the Company, the Board consisted of Defendants Barton, Blachford, Frink, Hoag, Maffei, Roscoff, Stephenson, and Underwood. Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

112.    The Board is currently comprised of eight (8) members – Defendants Barton, Blachford, Frink, Hoag, Maffei, Roscoff, Stephenson, and Underwood ("Director Defendants"). Thus, Plaintiff is required to show that a majority of Defendants, i.e., four (4), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

113.    These Director Defendants face a substantial likelihood of liability in this action

because they caused the Company to make false and/or misleading statements regarding the Company's co- marketing program. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Director Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

114.   The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

115.   The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

116.   The Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

117.   Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

118.   Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Director Defendants are unable to

comply with their fiduciary duties and prosecute this action.

119.    Additionally, each of the defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

120.    Defendant Rascoff has been CEO since 2010 and a director since 2011. Defendant Rascoff is a named Defendant in the instant action and in the Securities Class Actions. Defendant Rascoff is not disinterested or independent, and therefore, is incapable of considering demand because Rascoff (as CEO) is an employee of the Company who derives substantially all of his income from his employment with Zillow, making him not independent. As such, Rascoff cannot independently consider any demand to sue himself for breaching his fiduciary duties to Zillow, because that would expose him to liability and threaten his livelihood. Accordingly, Rascoff lacks independence from Defendants Blachford, Hoag, and Underwood, defendants who are not disinterested and who exert influence over Rascoff's compensation by virtue of their positions as representing the entire Compensation Committee. This lack of independence and financial benefits received by Rascoff renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

121.    Defendant Frink is the Company's co-founder and has served as Vice Chairman since March 2011, as a member of the Board since inception in December 2004, and as President since February 2005. Defendant Frink previously served as the Company's Vice President from December 2004 to February 2005, as its Treasurer from December 2009 to March 2011 and as its Chief Strategy Officer from September 2010 to March 2011. Defendant Fink is not disinterested or independent, and therefore, is incapable of considering demand because Fink (as Vice Chairman and President) is an employee of the Company who derives substantially all of his income from his employment with Zillow, making him not independent. As such, Fink cannot

independently consider any demand to sue himself for breaching his fiduciary duties to Zillow, because that would expose him to liability and threaten his livelihood.

122.    Accordingly, Fink lacks independence from Defendants Blachford, Hoag, and Underwood, defendants who are not disinterested and who exert influence over Fink's compensation by virtue of their positions as representing the entire Compensation Committee. Defendant Frink also owns 39.5% of the Class B voting stock of Zillow.

123.    Defendant Barton is the Company's co-founder and has served as Executive Chairman since September 2010. Defendant Barton has been a member of the Board since inception in December 2004 and served as Chief Executive Officer from inception until September 2010. Defendant Barton is not disinterested or independent, and therefore, is incapable of considering demand because Barton (as Executive Chairman) is an employee of the Company who derives substantially all of his income from his employment with Zillow, making him not independent. As such, Barton cannot independently consider any demand to sue himself for breaching his fiduciary duties to Zillow, because that would expose him to liability and threaten his livelihood.  Accordingly, Barton lacks independence from Defendants Blachford, Hoag, and Underwood, defendants who are not disinterested and who exert influence over Fink's compensation by virtue of their positions as representing the entire Compensation Committee.

124.    Further, Defendants Barton and Blachford are 50% co-owners of a condominium. And, Defendant Barton owns 60.5% of the Class B voting stock of Zillow.

125.    Defendants who served on the Audit Committee during the Relevant Period, face a substantial likelihood of liability in connection with their failure to ensure that Committee complied with its obligations. Maffei is the Chair of the Audit Committee and is described by the Company as an "financial expert".  Defendant Blachford is a member of the Audit Committee. Defendant Stephenson is a member of the Audit Committee.

126.   Defendants Maffei, Blachford, and Stephenson breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, inter alia, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the allegations that the Company violated Section 8 of RESPA and Section 1036 of the CFPA and whether the Company's advertising revenues violated regulations against kickbacks described above. Therefore, Defendants Maffei, Blachford, and Stephenson face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

127.   Defendant Blachford serves on the boards of directors of two privately held companies in which Defendant Barton is an investor and, for one of the companies, also serves as a board member.  Defendant Blachford's family member is employed by a privately held company for which Defendant Barton serves as board member.

128.   The Zillow Group is a customer of and made payments to Defendant Underwood's employer, Slack Technologies, Inc.

129.   Defendant Stephenson participates in Zillow Group's Premier Agent program, and Defendant Stephenson is the Managing Broker of Real Property Associates, which provides certain brokerage and rental management services to Defendant Rascoff.

130.   Defendants Barton and Rascoff, each in their individual capacity, and Defendant Maffei, through an entity that he owns and controls, have invested in various private equity and venture capital funds of Technology Crossover Ventures, or TCV Funds. Defendant Hoag is a direct or indirect director, limited partner, or member of the general partners of the TCV Funds.

131.   Defendant Blachford serves as a venture partner of Technology Crossover Ventures. Defendant Hoag co-founded Technology Crossover Ventures, a private equity and venture capital firm, in 1995 and continues to serve as a Founding General Partner.

**Insurance Considerations**

132.     The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Zillow. If there is a directors and officers' liability insurance policy covering the Relevant Period, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Individual Defendants were to sue themselves or certain officers of Zillow, there would be no directors' and officers' insurance protection. Accordingly, the Director Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Individual Defendants is futile and, therefore, excused.

133.     If there is no directors' and officers' liability insurance, then the Director Individual Defendants will not cause Zillow to sue any other wrongdoers, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

134.     Thus, for all the reasons set forth above, all of the Director Individual Defendants, and, if not all of them, at least a majority of Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants
*for Violations of Section 14(a) of the Exchange Act*

135.     Plaintiff incorporates by reference and re-alleges each and every allegation set

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

forth above, as though fully set forth herein.

136.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

137.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

138.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

139.    Here, the Company's Proxy Statement for 2017 violated Section 14(a) and Rule 14a-9 by omitting material facts. Defendants made false and/or misleading statements and/or failed to disclose that (a) the Company's co-marketing program did not comply with RESPA and (b) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

140.   The SEC created specific rules governing the content of disclosures made by public companies in their filings with the SEC that are incorporated by reference. Item 303(A)(3)(II) of Regulation S-K ("Item 303") provides guidance on what should be included in incorporated forms.

141.   Here, known trends existed at the time of the misleading statements and omissions in the Company's 2017 Proxy (which incorporated the Company's annual report), which failed to contain the disclosures required by Item 303. At the time the Company's 2017 Proxy was issued, the Company's co-marketing program did not comply with RESPA and (b) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

142.   The false and misleading elements of the annual Proxy led to the re-elections of all of the Director Individual Defendants, allowing them to continue breaching their fiduciary duties to Zillow.

143.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies.

144.   Plaintiff on behalf of Zillow has no adequate remedy at law.

145.   Zillow has no adequate remedy at law.

## SECOND CLAIM
### Against Individual Defendants
*for Breach of Fiduciary Duties*

146.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

147.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Zillow's business and affairs.

148.   Each of the Individual Defendants violated and breached their fiduciary duties of

candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

149.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Zillow.

150.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

151.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

152.    Also in breach of their fiduciary duties, the Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. In breach of their fiduciary duties owed to Zillow, Defendants caused the Company to make false and/or misleading statements regarding the Company's co-marketing program and that it did not comply with RESPA. The CFPB commenced an investigation into Zillow alleging that the Company violated Section 8 of RESPA and Section 1036 of CFPA and that the Company's advertising revenues violated regulations against kickbacks.

153.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

154.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless

disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

155.    The Individual Defendants had actual or constructive knowledge that they had caused and facilitated the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. Defendants had actual knowledge of the above misrepresentations and omissions of material facts set forth herein (as early as 2015), or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

156.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

157.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

158.    Plaintiff on behalf of Zillow has no adequate remedy at law.

**THIRD CLAIM**
**Against Individual Defendants**
*for Unjust Enrichment*

159.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

160.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Zillow.

161.    The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Zillow tied to the performance or artificially inflated valuation of Zillow, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

162.    Plaintiff, as a stockholder and a representative of Zillow, seeks restitution from the Director Individual Defendants and seeks an order from this Court disgorging all profits—including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

163.    Plaintiff on behalf of Zillow has no adequate remedy at law.

**FOURTH CLAIM**
**Against Individual Defendants**
*for Abuse of Control*

164.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

165.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

166.    As a direct and proximate result of Defendants' abuse of control, the Company has sustained significant damages. As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages.

167.    As a result of the misconduct alleged herein, Defendants are liable to the Company. Plaintiff, on behalf of the Company, has no adequate remedy at law.

**FIFTH CLAIM**
**Against Individual Defendants**
*for Waste of Corporate Assets*

168.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

169.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions and engage in internal investigations, and Zillow will lose financing from investors and business from future customers who no longer trust the Company and its products.

170.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused the Company to waste valuable corporate assets by failing to disclose that (a) the Company's co-marketing program did not comply with RESPA and (b) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

171.    Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

172.    Plaintiff on behalf of Zillow has no adequate remedy at law.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

## PRAYER FOR RELIEF

**FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of Zillow, and that Plaintiff is an adequate representative of the Company;

B.      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Zillow;

C.      Determining and awarding to Zillow the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.      Directing Zillow and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Zillow and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1)      A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

2)      A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

3)      Awarding Zillow restitution from Individual Defendants;

4)      Awarding Plaintiff the costs and disbursements of this action,

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 53

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

including reasonable attorneys' and experts' fees, costs, and expenses; and

5)      Granting such other and further relief as the Court may deem just and proper.

DATED:  March 5, 2021.

                                            BRESKIN JOHNSON & TOWNSEND, PLLC

                                    By:  *s/Roger M. Townsend*
                                            Roger M. Townsend, WSBA #25525
                                            1000 Second Avenue, Suite 3670
                                            Seattle, WA  98104
                                            Tel: (206) 652-8660
                                            Fax (206) 652-8290
                                            rtownsend@bjtlegal.com


                                            OF COUNSEL:

                                            LEVI & KORSINSKY, LLP
                                            Gregory M. Nespole
                                            Daniel Tepper
                                            55 Broadway, 10th Floor
                                            New York, NY 10006
                                            Tel: (212) 363-7500
                                            Fax: (212) 363-7171
                                            gnespole@zlk.com

                                            *Attorneys for Plaintiff Arjun Dua*